UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RACHEL KELTY,**

    **Plaintiff,**

    v.                                             Case No. 18-CV-762

**JOHN M. PATTERSON,
MICHAEL BEDNAREK, and
SARAH COOPER,**

    **Defendants.**

---

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST JOHN M. PATTERSON**

---

This matter is before me on plaintiff Rachel Kelty's motion for default judgment against defendant John M. Patterson under Fed. R. Civ. P. 55(b)(2). I held an evidentiary hearing on this motion on April 9, 2019 at which Kelty testified and presented other evidence. After carefully considering the evidence presented at the hearing and Kelty's post-hearing submission, for the reasons stated below, I recommend that the court grant Kelty's motion for default judgment against Patterson and award Kelty $900,000 in compensatory damages and $1,500,000 in punitive damages.

*1. Procedural Background*

On May 18, 2018, Rachel Kelty initiated this civil rights action against Michael Bednarek, Sarah Cooper, Ana Boatwright, and John M. Patterson based on sexual harassment and multiple sexual assaults she experienced as an inmate at Taycheedah Correctional Institution ("TCI"). (Docket # 1.) Kelty served her complaint on the defendants on May 31, 2018. (Docket # 28 at 1.) On June 25, 2018 Kelty requested an entry of default

against Patterson because he neither appeared nor answered the complaint. (Docket # 10.) On June 26, 2018, the Clerk of Court entered default as to Patterson. (Docket # 11.) On July 14, 2018, Kelty amended her complaint, removing Boatwright as a defendant. (Docket # 14.) On December 11, 2018, Kelty reached a settlement with Cooper and Bednarek. (Docket # 22, Docket # 26.) The parties filed a joint stipulation and order of dismissal on February 1, 2019, in which Kelty voluntarily dismissed Cooper and Bednarek. (Docket # 27.)

Kelty filed a motion for default judgment against Patterson on February 6, 2019. (Docket # 28.) Judge Stadtmueller then referred the case to me for the limited purpose of conducting a hearing on Kelty's motion and issuing a recommendation on whether the motion should be granted and, if so, what damages, fees, and costs Kelty is entitled to. (Docket # 29.)

*2. Amended Complaint*

Kelty's amended complaint states that in 2001, at the age of eighteen, she was sentenced to a term of confinement and assigned to the maximum-security unit at Taycheedah Correctional Institution ("TCI"). (*Id.* ¶¶ 10–11.) Around 2004, Kelty met Patterson, a correctional officer who occasionally worked on the maximum-security unit. (*Id.* ¶¶ 12–13.) Patterson was approximately fifty years old. (*Id.* ¶ 12.) After their initial meeting, Patterson was friendly towards Kelty and would joke around with her, establishing a comfortable rapport. (*Id.* ¶ 14.)

In June 2005, Kelty was transferred out of the maximum-security unit and moved to a medium-security unit at TCI. (*Id.* ¶ 15.) She was approximately twenty-two years old. (*Id.*) Patterson, who was then approximately fifty-one years old, was staffed at the medium-

2

security unit at the time. (*Id.* at 16.) Upon Kelty's arrival at the unit, Patterson continued his friendly ways, joking with Kelty and not strictly enforcing institutional rules. (*Id.* ¶ 17.)

During the summer of 2005, the medium-security unit was hot, and Kelty would sleep without a shirt for comfort. (*Id.* ¶ 19.) One night in the summer of 2005, Patterson repeatedly shined his flashlight into Kelty's face through her cell door as she slept, causing Kelty to awaken and sit up; the sheet that had been covering her fell off her upper body and exposed her breasts. (*Id.* ¶ 20.) Patterson stood at the window staring at Kelty and shining his light on her; he left the area only when Kelty's cellmate awoke angry that the light was being shone in the room. (*Id.* ¶ 21.) Approximately ten more times that summer, Patterson stopped at Kelty's cell after lights-out and shined his flashlight on her. (*Id.* ¶ 22.) Kelty understood this to be a signal that she was supposed to flash her private parts at Patterson, which she did. (*Id.*) Around the same time, Patterson also made inappropriate sexual comments to Kelty. (*Id.* ¶¶ 24–25.)

Kelty asserts that Patterson sexually assaulted her three times. The first sexual assault occurred sometime between June 30 and July 6, 2005. (*Id.* ¶ 26.) Patterson instructed Kelty to go to the blanket room to retrieve a laundry bag. (*Id.* ¶ 27.) Patterson accompanied Kelty to the blanket room, instructed her to enter, and blocked the door so that she could not exit. (*Id.* ¶ 28.) Without Kelty's permission, Patterson grabbed her breast and kissed her on the mouth. (*Id.* ¶ 29.) After that assault, Kelty attempted to avoid Patterson as much as possible, but he would force interactions, such as approaching the table where Kelty was eating with other inmates or opening the door to Kelty's cell soliciting her to come out. (*Id.* ¶¶ 30–32.)

Approximately two days after the first assault, Patterson opened the door to Kelty's cell and instructed her to get some sheets from the same blanket room where the prior sexual

3

assault had occurred. (*Id.* ¶¶ 33–34.) Patterson accompanied Kelty into the blanket room and blocked the exit. (*Id.* ¶¶ 35–36.) Patterson then lifted Kelty's shirt and touched and kissed her breasts; he also touched her buttocks and her crotch outside her clothes. (*Id.* ¶ 37.) Patterson pushed his body into Kelty so that she could feel that he had an erection. (*Id.* ¶ 38.) A few days after the second sexual assault, Patterson stopped by Kelty's cell following her shower time and watched her get dressed. (*Id.* ¶ 39.)

Sometime between July 21 and July 26, 2005, Patterson sexually assaulted Kelty a third time. (*Id.* ¶ 40.) Patterson opened Kelty's room and instructed her to obtain cleaning supplies from a janitor's closet and accompany him to a room across from the maintenance room in AB North. (*Id.* ¶¶ 41–42.) Patterson instructed Kelty to go inside and clean the room, followed her inside, and shut the door. (*Id.* ¶¶ 43–45.) Patterson instructed Kelty to remove her shorts, which she did. (*Id.* ¶ 46.) Patterson then forcibly placed Kelty on a table, knelt down, and began performing nonconsensual oral sex. (*Id.* ¶ 47.) Patterson then forcibly placed Kelty's hand on his erect penis. (*Id.* ¶ 48.) Kelty pushed Patterson away and left the room. (*Id.* ¶ 49.)

At no time did Kelty consent to any of Patterson's sexual acts. (*Id.* ¶ 50.) During every sexual assault, Kelty was terrified. (*Id.* ¶ 51.) Kelty was not sexually attracted to men, which was known to Patterson. (*Id.* ¶ 52.) Patterson's sexual assaults caused Kelty fear, anger, shock, and disgust. (*Id.* ¶ 53.) They made Kelty feel worthless and disposable because, given Patterson's position of power over her, she had no recourse; she did not feel like she could report the assaults to any authority and, even if she did, she did not think any authority would believe her. (*Id.* ¶ 54.)

On or about October 6, 2005, the Fond du Lac Police Department commenced an investigation into Patterson's sexual assault of Kelty. (*Id.* ¶ 55.) On October 7, 2005, Patterson gave a statement to police admitting that he twice sexually assaulted Kelty at TCI. (*Id.* ¶ 56.) That investigation resulted in two felony charges being filed against Patterson on October 19, 2005, for his sexual assault of Kelty. (*Id.* ¶ 57.) On April 12, 2006, Patterson pleaded no contest to two counts of having had sexual contact with Kelty without her consent. (*Id.* ¶ 58.) He was sentenced to probation. (*Id.*) Kelty received no compensation as a result of Patterson's prosecution, nor has she received any other award of damages as a victim of Patterson's sexual assaults. (*Id.* ¶ 59.)

Kelty's amended complaint claims that Patterson's behavior violated her right to humane conditions of confinement as guaranteed by the Eighth Amendment and 42 U.S.C. § 1983 and her constitutional right to privacy. (*Id.* ¶ 94.) She also claims that Patterson's conduct constituted intentional discrimination on the basis of sex in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. (*Id.* ¶ 98.) Kelty claims that Patterson's conduct caused physical, psychological, and emotional injuries, and financial loss, which she will continue to suffer in the future. (*Id.* ¶¶ 95, 99.) She also claims that Patterson's unlawful conduct was intentional and malicious or was wantonly committed in reckless or callous disregard of her constitutional rights. (*Id.* ¶¶ 96, 100.) Kelty requests compensatory and punitive damages as well as attorney's fees and costs. (*Id.* at 16.)

    3. *Evidentiary Hearing*

Kelty testified that in 2001, at the age of eighteen, she was incarcerated at TCI and housed in the maximum-security unit. (Tr. 6–7.) Kelty testified that she had never been to prison before and felt nervous, scared, and alone. (Tr. 8.) She met Patterson in 2004 or 2005

5

as he occasionally worked in the maximum-security unit. (Tr. 8). Kelty testified that during his rounds, Patterson would laugh and joke around with her and was more relatable than the other TCI officers. (Tr. 9.)

Kelty further testified that after four years in the maximum-security unit she was moved to the medium-security unit. (Tr. 10.) At that time, she was twenty-two years old. (Tr. 12.) Patterson, whom Kelty testified was fifty-two years old, worked in the medium-security unit as the regular second shift officer. (Tr. 10, 12.) Kelty stated that upon her removal to the medium-security unit, her interactions with Patterson continued as before. (Tr. 12–13.) She testified that Patterson continued to joke around with her and other inmates and was more relatable than the other officers. (*Id*.) She testified that Patterson was also more lenient with her than with other inmates; he did not reprimand her when she violated prison policies. (Tr. 13.)

Kelty testified that after she had been in the medium-security unit for about two weeks, Patterson's conduct toward her changed. (*Id*.) She testified that Patterson used a flashlight on one occasion to inappropriately leer into her cell after lights-out and then lingered to gawk at her exposed breasts. (Tr. 13–15.) Weeks later, Patterson made a comment to Kelty about kissing her between her thighs. (Tr. 16.) Then, within a matter of days, he used his authority to orchestrate three separate opportunities to attack Kelty. First, he caused her to report to the laundry room alone, came up from behind her, grabbed her breast, and kissed her. (Tr. 17–18.) Days later, during the second orchestrated encounter in the linen room, Patterson lifted Kelty's shirt, touched and kissed her breast, and grabbed her buttocks and vagina through her clothes. (Tr. 19–20.) Patterson's third attack of Kelty, also within days, occurred in the cleaning supply closet. Having escorted Kelty to the supply room and as Kelty pushed the cleaning supplies into the room, Patterson immediately entered the room behind her and

6

closed the door. (Tr. 22.) He then pushed Kelty onto a table, pull down her shorts, and performed oral sex on her, touching her buttocks and her vagina. (*Id.*) He then placed her hand on his penis. (Tr. 23.)

Kelty testified that she was able to escape each assault by pushing Patterson away and leaving the room. (*Id.*) Kelty further described how each attack invoked fear as well as deep feelings of worthlessness, hopelessness, and an inability to keep herself safe. (*Id.*) She added that, after each attack, Patterson would act as if nothing had happened. (*Id.*) Kelty testified that his pretense that nothing had happened made her feel "disgusted" and "shocked," and she could not believe that Patterson could be "so heartless, like, he just didn't care." (Tr. 24.)

Additionally, Kelty testified that Patterson's assaults have greatly impacted her life. She testified that she had nightmares and flashbacks after Patterson's assaults. (Tr. 35.) She testified that Patterson's sexual assaults retriggered memories of sexual assaults that she suffered as a child. (Tr. 29–30.) She also testified to cutting herself as a result of Patterson's assaults. (Tr. 40.) Kelty testified that the assaults made her feel ashamed and hopeless and have made it hard for her to trust people and form relationships. (Tr. 43, 46.)

Kelty further testified and presented evidence that at the onset of her incarceration she had not been diagnosed with any mental health challenges, but that since Patterson's assaults, she has been diagnosed with post-traumatic stress disorder and major depressive disorder; has had to seek and maintain psychological counseling; and has been prescribed a significant number of medications to cope with the trauma. (Tr. 31–56; Exs. 1–9.)

    *4. Analysis*

        4.1    Legal Standard

Federal Rule of Civil Procedure 55 provides a two-step process for obtaining a default judgment against a party from "whom a judgment for affirmative relief is sought." First, if

that party "has failed to plead or otherwise defend" himself in the lawsuit, upon such a showing "by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P 55(a). Once the default is established, "[t]he defaulting party cannot contest the fact of his liability unless the entry of default is vacated under Rule 55(c)." *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (citing 10 JAMES W.M. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 55.32 [1][a] (3d ed. 2013) ("After defaulting, a party has no right to dispute the issue of liability.")). "The basic effect of an entry of default (step one) is that '[u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true.'" *Id.* (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)); *see Black v. Lane*, 22 F.3d 1395, 1399 & 1403 (7th Cir. 1994); *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990).

Even after entry of default, the plaintiff must still seek a default judgment, the determination of rights. *Id.* (citing *United States v. Borchardt*, 470 F.2d 257, 260 (7th Cir. 1972)). For this second step, Rule 55 provides the plaintiff with two methods for securing a default judgment. After the clerk enters default, the plaintiff may request that the clerk enter judgment in an amount that is "a sum certain or a sum that can be made certain by computation." Fed. R. Civ. P. 55(b)(1). But, when the plaintiff's claim is not for a sum certain or a sum made certain by calculation, the plaintiff must apply to the court for a default judgment under Rule 55(b)(2).

The district court exercises broad discretion when deciding whether to enter a default judgment. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993) (citing *Merrill Lynch Mortg. Corp.*, 908 F.2d at 250). When considering a motion for default judgment, the court may hold a hearing if "it needs to (A) conduct an accounting; (B) determine the

amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). "'A default judgment establishes, as a matter of law, that defendants are liable to plaintiff on each cause of action alleged in the complaint.'" *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) (citing *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007)). The well-pled allegations of the complaint relating to liability are taken as true. *Id*. However, "those relating to the amount of damages suffered ordinarily are not." *Id*. (citing *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2688, at 58–59 (3d ed. 1998 & Supp. 2012) ("If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.")). The plaintiff must further establish entitlement to the relief sought. *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). Thus, the court must conduct a hearing on damages "to establish the truth of any averments by evidence." *Di Mucci*, 879 F.2d at 1497.

    4.2    Default Judgment – Liability

Kelty alleges that Patterson acted with deliberate indifference to her health or safety in violation of the Eight Amendment and § 1983. (Docket # 14 ¶ 94.) Deliberate indifference is found if (1) the harm to the plaintiff was objectively serious, and (2) the official was deliberately indifferent to her health or safety. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

Kelty has established both components. First, sexual assault is an objectively serious harm. *See Ramos v. Hamblin*, 840 F.3d 442, 444 (7th Cir. 2016) ("A 2003 federal statute, the Prison Rape Elimination Act, 42 U.S.C. §§ 15601–15609, as the name implies, and corresponding rules of the Wisconsin Department of Corrections, Executive Directives 16A

9

and 72, make the prevention of prison rape a priority concern of prison administrators."). Second, Kelty has established that Patterson was deliberately indifferent to that objectively serious risk of harm. Kelty's testimony supports the conclusion that Patterson sexually harassed Kelty and engaged in three nonconsensual sexual acts against Kelty in complete disregard of the harm he was inflicting. Thus, Kelty has established that Patterson violated her Eighth Amendment rights under 42 U.S.C. § 1983. She is therefore entitled to judgment in her favor on liability.

### 4.3  Default Judgment – Damages

Next, I must determine the amount of damages that Kelty may recover for Patterson's § 1983 violation. When a state actor is found to have violated a person's constitutional rights, "section 1983 may authorize an award of damages against the government and/or its officers. These damages may include compensation for intangible emotional harm and even nominal damages where no actual injury occurs." *Manley v. Law*, 889 F.3d 885, 890 (7th Cir. 2018), *reh'g denied* (June 8, 2018) (citing *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978)). "Compensatory damages in § 1983 cases are ordinarily determined according to the principles derived from the common law of torts." *Hagge v. Bauer*, 827 F.2d 101, 109 (7th Cir. 1987). These damages may include not only "out-of-pocket loss and other monetary harms," but also "personal humiliation, mental anguish and suffering." *Id.* (citing *Memphis Community School District v. Stachura*, 477 U.S. 299, 307 (1986)). A plaintiff seeking compensatory damages must show proof of actual damages. *Id.* (citing *Bailey v. Andrews*, 811 F.2d 366 (7th Cir. 1987); *Taliferro v. Augle*, 757 F.2d 157 (7th Cir. 1985)).

A § 1983 plaintiff also may recover punitive damages. *Smith v. Wade*, 461 U.S. 30, 35 (1983). "'Punitive damages are appropriate when the defendant acted wantonly and willfully

or was motivated in his actions by ill will or a desire to injure.'" *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009) (quoting *Hagge*, 827 F.2d at 110). The focus in awarding punitive damages is to "punish blameworthy behavior and deter defendants from committing future bad acts—the more reprehensible a defendant's conduct and the more easily a defendant can conceal violations, the higher the punitive damages." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018) (citing *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 508 (7th Cir. 1992)). In deciding on the amount of punitive damages, courts consider "the reprehensibility of the defendant's conduct, the ratio between punitive and compensatory damages, and any civil penalties that punish similar behavior." *Id*. (citing *BMW of North America, Inc. v. Gore*, 517 U. S. 559, 574–74 (1996)).

Instructionally, the Seventh Circuit has observed that, in determining compensatory and punitive damages, case comparisons "are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson*, 589 F.3d at 892 (citation omitted). "The required 'rational connection' between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering." *Id*. The court noted that damages for pain and suffering "are very difficult to quantify," and said that in jury cases, it is up to the jury to "select a dollar amount that it believes will fairly compensate the plaintiff." *Id*. (citing *Fenolio v. Smith*, 802 F.2d 256, 259–60 (7th Cir. 1986)).

Kelty has presented sufficient evidence to demonstrate that she sustained injuries from Patterson's harassment and sexual assaults. She testified to how Patterson gained her trust by presenting himself as the "friendly uncle." She testified how he then used that trust as well as his authority to manipulate situations that allowed him to show and subsequently increase his sexual aggressiveness toward Kelty. He moved from first gawking at her exposed body to

11

within a matter of weeks sexually assaulting her with groping, kissing, and unwanted oral sex. Moreover, between his incidents of harassment and the three sexual assaults, Kelty noted that Patterson added to her injury by continuing to hang around her, strike up conversations, and laugh and joke as if nothing had happened. Kelty also testified that other corrections officers repeatedly harassed her for reporting Patterson. (Tr. 27–29.)

Kelty also testified how the encounters with Patterson triggered memories of childhood sexual abuse she endured. (Tr. 29–30.) That abuse was also perpetrated by people in a position of trust and authority in Kelty's life: members of her religious community. (Tr. 49–50.) She testified that she had received little to no counseling for that trauma and had simply moved on with her life (Tr. 50), only to have the memory of the incident resurrected and compounded by Patterson's abuse in her early adulthood. She testified that, because of Patterson, she began having nightmares and feared any situation in which she was alone with any guard. (Tr. 35–36, 48–49.) Kelty testified that now she cannot maintain any close relationships beyond her immediate family, that she does not trust anyone, and that she had been prescribed a significant number of medications upon her release from prison for her mental health conditions, including post-traumatic stress disorder and major depressive disorder. (Tr. 31–58.) She testified that she stopped taking the medications when she became pregnant, but that cessation caused her mental health to spiral downward, resulting in her using alcohol to cope. (Tr. 53–54, 56–57.) Kelty further testified that this ultimately led to her reincarceration. (Tr. 57.) Now off medication, Kelty testified that she relies on extreme exercising to maintain some semblance of mental health. (Tr. 53.) Yet, she continues to have feelings of worthlessness, shame, anxiety, and low self-esteem, and difficulty with relationships. (Tr. 43–58.) She stated that she continues to receive counseling and believes she will never "get over" what happened. (Tr. 42, 45.)

Kelty seeks $5,150,000 in compensatory damages based on the three sexual assaults, the psychological trauma she suffered from each assault up until now, and the psychological trauma she will continue to suffer. (Docket # 34 at 6–8; Hrg. Tr. 64–71; Ex. 11.) Additionally, Kelty asks for $5,000,000 in punitive damages because Patterson received only probation for his criminal assault conviction against her and because of TCI's alleged history of allowing sexual contact between inmates and staff. (Docket # 34 at 4–6; Hrg. Tr. 71–74; Ex. 11.)

In support of her requested damages, Kelty cites to four cases: *J.K.J. v. Polk Cty.*, No. 15-CV-428-WMC, 2018 WL 2271166 (W.D. Wis. May 17, 2018); *Marsh v. Campana*, No. 4:17-CV-3001, 2018 WL 4639116 (D. Neb. Sept. 27, 2018); *Martin v. Thicklen*, No. 14-CV-200-JPS, 2017 WL 4326512 (E.D. Wis. Sept. 28, 2017); and *Glover v. Johnson*, No. CIV-14-936-F (W.D. Okla.). (Docket # 34.)

In *J.K.J.*, two female inmates alleged they had been assaulted multiple times over a two-year period by the same jail official. The jail official in that case was criminally charged and pleaded guilty. He was sentenced to sixty years imprisonment. The plaintiffs were each awarded $2,000,000 in compensatory damages and $3,750,000 in punitive damages.

In *Marsh*, the plaintiff alleged that, while she was serving a five-day sentence, a jail official sexually assaulted her once by pinning her against the corner of her cell, kissing her neck, fondling her breast, and digitally penetrating her vagina. The plaintiff was awarded $810,000 in compensatory damages and $250,000 in punitive damages.

The plaintiff in *Glover* alleged that she was repeatedly sexually harassed and once sexually assaulted by the assistant police chief. No. CIV-14-936-F (W.D. Okla.), ECF No. 43 at 11–16. The plaintiff was awarded $6,500,000 in compensatory damages; the jury was not presented with the option of awarding punitive damages. *Id.*, ECF No. 199 at 2.

13

Kelty particularly highlights *Martin*, which was also before Judge Stadtmueller. In that case, the plaintiff suffered multiple sexual assaults that involved nonconsensual anal and vaginal penetration while she was pregnant and nonconsensual oral sex days after her delivery. No. 14-CV-200-JPS (E.D. Wis.), ECF. No. 104 at 3–8. After a jury trial, the plaintiff was awarded $1,700,000 in compensatory damages and $5,000,000 in punitive damages. *Id.*, ECF No. 304 at 1.

I have also reviewed other cases where the plaintiff was sexually assaulted by a prison officer and subsequently sought and was awarded damages for the assault: *Amador v. Galbreath*, 30 NY. J.V.R.A. 6:10, 2013 WL 4081919 (W.D.N.Y. Apr. 24, 2013); *Eckert v. Rivenburg*, No. 49D05-1007-CT-031632, 2012 WL 7157090 (Ind. Super. July 13, 2012); and *Doe v. City of Chicago*, No. 04-cv-01917, 2008 WL 5235472 (N.D. Ill. Apr. 30, 2008). In those cases, total damages ranged from $200,000 to $1,500,000.

*Amador* provides a useful point of comparison. In that case, a prison official forced the plaintiff to "perform oral sex on him and, ignor[ed] her pleas for him to stop and made forcible oral sexual contact with the plaintiff." *Amador*, 2013 WL 4081919, at *1. The assault "triggered and exacerbated the plaintiff's preexisting post-traumatic stress disorder (PTSD), which was the result of a history of childhood sexual abuse, domestic violence, gang rape, and sexual harassment by a different corrections officer at the same prison." *Id*. The plaintiff in that case was awarded $250,000 in compensatory damages and $250,000 in punitive damages. *Id*.

Keeping the Seventh Circuit's admonishment about the difficulty in comparing damage awards in mind, and acknowledging the horror of all sexual assaults, I find that this case does not present the aggravating factors that were in *Martin*, the case Kelty has

emphasized. As discussed above, in *Martin*, the plaintiff suffered repeated sexual assaults while pregnant and in the postpartum period. In upholding the jury's compensatory damages award of $1,700,000, Judge Stadtmueller opined that the inmate-victim's pregnancy and childbirth made her "exceedingly vulnerable" and added another dimension to the injury and the reprehensibility of the perpetrator's conduct. 2017 WL 4326512, at *4. This special factor is not present in Kelty's case. However, I also find that the damages award of $250,000 in *Amador* would be insufficient to compensate Kelty for the harm she experienced. Patterson assaulted Kelty not once, but three times, with the last incident culminating in forced oral sex on her. He also subjected her to sexual harassment and psychological trauma at other times. Based on Kelty's testimony regarding the emotional pain and scarring and the PTSD she continues to suffer, a review of her medical records that evinces her mental health decline and ongoing struggle, and general guidance from the cases reviewed, I recommend that Kelty be awarded $900,000 in compensatory damages.

I also find that punitive damages are appropriate. Patterson's job was to keep inmates safe; he did the opposite. He repeatedly abused his position of power and Kelty's trust, preying upon a victim who was not only incarcerated but also young and inexperienced in the prison system.[1] Kelty's testimony establishes that Patterson acted with an evil intent and callous indifference to her federally protected rights. Punitive damages are warranted to punish Patterson for his reprehensible conduct and to deter other corrections officers from sexually assaulting inmates, or otherwise abusing the trust placed in them by inmates and the public. The amount of $1,500,000 is adequate for these purposes.

---

[1] I note also that Kelty was not Patterson's only victim. In his criminal case, Patterson pleaded no contest to sexual assault of another inmate in addition to two assaults of Kelty. (Tr. 25.) *State v. Patterson*, 2005CF000405 (Fond Du Lac Cty., Apr. 12, 2006).

### 4.4 Attorney's Fees and Costs

Finally, under 42 U.S.C. § 1988, a court may award attorney's fees and costs to a "prevailing party" in a § 1983 action. "This fee-shifting law is designed to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Murphy v. Smith*, 864 F.3d 583, 586 (7th Cir. 2017) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)). The prevailing attorney seeking compensation under § 1988 bears the initial burden of demonstrating the reasonableness of the requested fees by "'produc[ing] satisfactory evidence-in addition to the attorney's own affidavits-that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)).

Kelty's attorney filed a declaration with the court averring a total of $16,340.00 in attorney's fees and $1,009.73 in costs incurred in the prosecution of Kelty's civil rights claim against Patterson. (Docket # 35.) In support of his declaration, Kelty's attorney attaches a copy of his fee agreement with Kelty that includes his hourly rate (Docket # 35-1 at 4), his firm time entries for work associated with this case from its onset (Docket ## 35-2 to 35-3), and an itemization of his costs associated with this litigation since its commencement (Docket ## 35-4 to 35-6). Kelty's attorney, however, fails to include any evidence showing that his rates are "in line with those prevailing in the community." *Pickett*, 664 F. 3d at 640. Thus, I cannot recommend the award of his requested attorney's fees and costs at this time. I will grant Kelty's attorney leave to address this deficiency.

**IT IS THEREFORE RECOMMENDED** that Kelty's motion for default judgment as to John M. Patterson (Docket # 28) be **GRANTED**.

**IT IS ALSO RECOMMENDED** that Kelty be **AWARDED** $900,000 in compensatory damages and $1,500,000 in punitive damages.

**IT IS HEREBY ORDERED** that counsel for Kelty shall supplement his submission for attorney's fees within **ten (10)** days of this report and recommendation.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin, this 10th day of June, 2019.

**BY THE COURT:**

*s/ Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge